# United States Court of Appeals
## For the First Circuit

No. 21-1137

UNITED STATES,

Appellant,

v.

MARIO R. RIVERA-RODRÍGUEZ, a/k/a Papolín,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Gelpí, Howard, and Thompson,
Circuit Judges.

David C. Bornstein, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, were on brief for appellant.

Samuel Carrion, with whom Eric Alexander Vos, Federal Public Defender, Franco L. Pérez-Redondo, Assistant Federal Public Defender, and Kevin E. Lerman, Research & Writing Attorney, were on brief for appellee.

July 20, 2023

**THOMPSON, Circuit Judge**. Today's appeal confronts both the extraordinary and the, arguably, mundane. The government seeks reversal of two district court rulings, one granting appellee, Mario Rivera-Rodríguez ("Rivera"), compassionate release from incarceration, the other denying the government's subsequent request for reconsideration. We face the extraordinary as we contemplate whether the district court below was obligated to rescind the compassionate release it had granted to Rivera premised upon his heightened health risks associated with the COVID-19 virus (COVID) (in and of itself, an extraordinary remedy). And we face the mundane as we consider whether it was reasonable for the court to conclude, in the exercise of its considerable discretion, that although Rivera had in fact been vaccinated before his release, reconsideration of its initial judgment was not warranted here.

For reasons we get into below, we affirm. We begin by describing the events leading up to, and following, the district court's release grant before zooming out to provide broader context on compassionate release and the government's authority to appeal its grant. We conclude by exploring the merits of the government's challenges to both judgments below -- arguments we ultimately reject.

# I. Background

## A. Rivera's Crime & Sentencing

On August 6, 2009, Saro Díaz-Rosa lost his life at the hands of Rivera and another person (an unidentified "John Doe"). Rivera and an accomplice, arriving at a gas station in Río Grande, Puerto Rico, spotted Díaz-Rosa standing at an air pump. After sizing him up and making the decision to steal his Ford Club Wagon, they proceeded to shoot at Díaz-Rosa multiple times, ultimately killing him. Hightailing the vehicle away from the station, Rivera and his compadre wound up abandoning it later in the day on Calle Yunquecito in Carolina.

While to this day his accomplice remains unidentified, Rivera surrendered and was arrested by authorities the following month. In October 2009, he was indicted for carjacking resulting in death in violation of 18 U.S.C. § 2119(3) and discharging a firearm causing the murder of a person in violation of 18 U.S.C. § 924(c)(1)(A)(iii), (j).

Eventually, Rivera accepted a plea agreement, under which he pled guilty to the carjacking count in exchange for the government's agreement to drop the firearms charge and recommend

he serve a 240-month prison sentence.[1]  The agreement was reviewed by the court during Rivera's November 2011 sentencing hearing.[2]

Pursuant to its sentencing tasks, the court, after determining the applicable guideline sentencing range to be from 210 to 262 months, accepted the government's recommendation under the agreement -- imposing a term of 240 months of incarceration, followed by five years of supervised release.

### B.  COVID & Compassionate Release

Nearly nine years later, along comes COVID.  On January 31, 2020, federal authorities declared the highly transmissible virus to be a public health emergency.  See Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).  As the

---

[1] Under the terms of the agreement, he also agreed to withdraw a motion he had filed seeking to suppress his confession, which he had given after waiving his Miranda rights.  See Miranda v. Arizona, 384 U.S. 436, 475 (1966) ("If [an] interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.").

[2] During the hearing the court acknowledged several mitigating sentencing factors raised by the defense such as Rivera's various familial traumas, including his troubled childhood.  The same went for Rivera's issues with addiction and his mental, cognitive, and emotional deficiencies.  At one point, the court raised Rivera's probable "frontal lobe structural deficiencies . . . which [affect] the ability to understand the consequences of certain actions."  The hearing also included testimony from Díaz-Rosa's family expressing the significant devastation and struggles they faced since his death, and from Rivera expressing his deep remorse for the crime he had committed.

pandemic presented health risks to vulnerable communities throughout the globe, our public health authorities concluded that the risk of infection was particularly acute among those housed in densely occupied congregate settings such as prisons. See Centers for Disease Control and Prevention, *Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/corona virus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

That October, represented by the public defender, Rivera, who his prison FCI Butner I ("Butner") had classified as a chronic care inmate, identified himself as uniquely at risk of death or severe illness were he to contract COVID, due to his obesity, chronic hypertension, and pre-diabetes. Accordingly, he motioned the court for compassionate release under the First Step Act, 18 U.S.C. § 3582(c)(1)(A), which authorizes the federal courts to reduce an incarcerated individual's prison term should there be "extraordinary and compelling" reasons for doing so.[3] In his written submission, he argued that his heightened health risks

---

[3] 18 U.S.C. § 3582(c)(1)(A)(i) states that a court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction . . . ."

- 5 -

constituted an extraordinary and compelling reason to release him from prison, particularly given that several COVID outbreaks had occurred at Butner, and had resulted in the death of multiple incarcerated persons there. As Rivera urged, citing to United States v. Amarrah, which we quote: "The Court sentenced Defendant to [240] months in prison; it did not sentence him to death or to incarceration that carries a significant risk of death." 458 F. Supp. 3d 611, 618 (E.D. Mich. 2020). Besides his health factors, Rivera also pointed to his good behavior while incarcerated -- he'd experienced only one minor disciplinary infraction ten years prior -- and his extensive efforts at rehabilitation while serving his sentence -- he'd taken numerous BOP (Federal Bureau of Prisons) courses heavy on education and personal development and had an outstanding employment record during his imprisonment -- arguing that because of the steps he had taken to reform himself, he would not be a danger to the community were he to be released. In support of his motion, Rivera submitted his prison medical records, education transcripts, and a job reference letter, as well as the compassionate release request form he had submitted to the BOP (upon which the BOP had failed to act) before filing his own motion. He requested his sentence be reduced to time served, with a condition that he be placed in home detention and electronic monitoring for the first year of his supervised release term.

The government emphatically objected. In a written submission, it highlighted the measures taken by the BOP to minimize the risk of COVID transmission into and throughout its facilities. It further insisted that Rivera's medical conditions did not rise to the level of extraordinary and compelling circumstances required for release, and, even if they did, releasing him after only eleven years would be inappropriate given the severity of both his offense and his prior criminal history.[4] Responding to the government's filing, Rivera presented a point-by-point rebuttal to the merits of each objection, and further urged that, against the backdrop of the serious risks presented by COVID in Butner (and given his significant steps towards rehabilitation), the court should err on the side of protecting his life and health by granting him early release.

Neither side requested a hearing, and on January 8, 2021, the court issued a ruling on the papers. In it, the court described Rivera as "a 48-year-old man suffering from obesity, hypertension, and potentially undiagnosed Type II Diabetes, conditions that increase his risk of severe illness from COVID-19." The court

---

[4] Rivera had previously been arrested and convicted for offenses stemming from charges of breaking and entering a home and stealing property from it, including a video camera that he later sold, domestic violence, committing armed robbery, resisting a public authority while driving an unauthorized vehicle with the intent to distribute marijuana, and unlawfully possessing a loaded firearm.

also observed that nine individuals incarcerated at Butner had died due to COVID.[5]  It concluded that this number of deaths, alongside Rivera's medical conditions, qualified as extraordinary and compelling reasons justifying early release.  The court further noted his impressive disciplinary record and rehabilitative efforts while incarcerated, as well as the fact that Rivera had "already served more than 11 years of his sentence, 57% of his statutory term (and 66% if you take into account his expected release date for good conduct . . .)."

In the order granting Rivera's motion, the court reduced Rivera's sentence to time served and modified his release conditions to impose home detention and electronic monitoring for the first three years of his five-year supervised release term. In so doing the court made clear that a modified sentence "would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."

## C.  The Government's Appeal & Rivera's Release

Before the ink could dry on the district court's order, the government filed an immediate appeal, along with an emergency motion asking the district court to stay Rivera's release in the

---

[5]  The government, in its subsequent motion for reconsideration, corrected the record on this point by identifying that two of these deaths did not occur at Butner, but instead at an adjacent minimum security satellite camp. Rivera, when opposing the motion, agreed with this correction.

meantime. In its motion, the government emphasized the fact that doses of a COVID vaccine had already been delivered to Butner, and that Rivera would likely receive one relatively soon. The motion reiterated the severity of Rivera's crime and his risk of re-offending, and it urged the district court to stay Rivera's release until the First Circuit could have a chance to weigh in. In response, the district court issued a temporary stay of Rivera's release until January 12th and directed him to respond to the government's motion before that date, which he did on January 11th.

In his reply, Rivera opposed the government's stay request stressing the government had failed, for a couple of primary reasons, to meet its burden for obtaining such a stay. First, Rivera predicted the government was unlikely to succeed on the merits. Second, he maintained that given his numerous health infirmities, he would face irreparable harm if incarcerated while the government's appeal was pending. Conversely, said Rivera, the government would face no harm if he was kept in home confinement per the modified terms of his supervised release as such a condition provided adequate protection for the public. Continuing, he argued that denying the stay and allowing him to remain outside the prison benefitted the public interest because it maintained the normal course of appellate proceedings,[6] which

_____

[6] A heads up to the reader. Throughout this back and forth, neither the government nor Rivera addressed the source (nor posited

typically do not involve staying a lower court's decision absent unusual circumstances, and reduced the prison population, thus lessening the marginal risk he posed to furthering the transmission of the virus within the prison. While Rivera did acknowledge the government's new proffer that Butner might soon have vaccines available, he did not respond to it specifically. Rather, he accused the government of making no attempt "to address the legal standard for securing a stay."

In a surprising turn of events, Rivera submitted two additional filings on January 11, 2021 (which turned out to be a very busy day for court filings). First, he filed an informative motion alerting the court that he had, in fact, already been released from prison as per the court's January 8th order and prior to the court temporarily staying that release. Second, he filed a motion requesting the district court lift the stay of his release and instead maintain the status quo, allowing him to remain outside Butner while the lower court contemplated a final ruling on whether to grant a permanent stay during the pendency of the government's appeal before this court.

---

a lack) of jurisdiction over the government's appeal from his compassionate release order. Given their silence, the government's notice of appeal and motion to stay, as well as Rivera's opposition to the latter, all appear to assume that the government was authorized to bring such an appeal. We'll get to this jurisdictional wrinkle shortly.

### D. The Government's Motion to Reconsider

Later, on January 11th, the district court was apprised of yet another twist: In an emergency motion for reconsideration filed by the government, it informed the court that unbeknownst to the court, the government, and even defense counsel, Rivera had already been vaccinated prior to his release. Rivera, the government had just learned, received his first dose of the Pfizer-BioNTech COVID vaccine on December 19, 2020 (some nineteen days prior to the court's January 8th order granting his compassionate release) and a second dose on January 5, 2021 (three days before the release order was issued and implemented).

Rivera promptly filed an objection to the reconsideration request. According to defense counsel, although he had not been personally aware of Rivera's vaccination status, in his view Rivera's numerous health risks still counseled in favor of denying the government's motion. Hours after receiving the filings, the court issued a line order denying the reconsideration motion. Given the pendency of the government's appeal, the court determined it lacked jurisdiction over the government's motion. The next day, rather than proceed with its appeal or seek an indicative ruling on its reconsideration request pursuant to Federal Rule of Civil Procedure 62.1,[7] the government opted to

---

[7] Federal Rule of Civil Procedure 62.1(a)(3) states that "[i]f a timely motion is made for relief that the court lacks authority

- 11 -

withdraw its appeal, thereby restoring the district court's authority over the controversy.

Two days later, on January 14, 2021, the government filed a renewed motion to reconsider, once again asking the court to vacate its compassionate release order.[8] In general, the government cited newly discovered evidence, and presented fresh legal arguments as reasons for the court to reverse course. More specifically, it argued first that the compassionate release order had been based on inaccurate information, that is, the threat COVID posed to Rivera based upon the assumption that he had not been vaccinated. Second, the government contended that the court's order had overestimated the overall risk of COVID at Butner -- noting that only one person incarcerated at the facility had COVID at the time of filing, and that no deaths had occurred there in eight months. Attesting to this latter assertion, and attached to the motion, was a declaration by Andrew Stock, the Clinical Director at the Federal Medical Center serving those incarcerated at Butner. In Stock's declaration, he described the various

_____

to grant because of an appeal that has been docketed and is pending, the court may," in an indicative ruling, "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."

[8] Like its emergency motion to reconsider, the government's renewed motion apparently assumed the motion was properly raised, as it did not specifically assert the court's jurisdictional authority to reconsider its compassionate release decision.

actions taken by the BOP in order to address and mitigate the risk of COVID within the facility. He also described the circumstances surrounding those who had died from COVID while incarcerated there (totaling twenty-seven throughout the five facilities making up the broader Federal Correctional Complex containing Butner).[9] Third, on the rehabilitation front, the government challenged the court's characterization of Rivera as greatly rehabilitated and asserted that, either way, his reduced sentence failed to adequately reflect the severity of his crime.

---

[9] For context, as Rivera describes in his brief, conditions at Butner were exceptionally bad. According to a pandemic response report issued by the Department of Justice, there were regular failures to follow BOP quarantine guidance within the facility, a lack of widespread COVID testing for long periods of time, and cross-contamination between facilities by staff. As of January 17, 2021 (shortly after the government sought reconsideration in this case), "226 inmates had active COVID-19 cases and 2 additional inmates had died as a result of COVID-19, bringing to 27 the total number of Butner inmate deaths caused by COVID-19." Department of Justice Office of the Inspector General, Pandemic Response Report 21-031, Remote Inspection of Federal Correctional Complex Butner (Jan. 2021), https://www.oversight.gov/sites/default/files/oig-reports/DOJ/21-031.pdf. Additionally, twenty-three staff members had active COVID cases at the time. Id.

As an aside, Stock's declaration was initially filed by the BOP on June 3, 2020, in response to a class-action lawsuit brought on behalf of individuals incarcerated at Butner and adjacent facilities, who sought sweeping relief from the disturbing conditions throughout the federal complex. See Hallinan v. Scarantino, 466 F. Supp. 3d 587, 590 (E.D.N.C. 2020) ("[P]etitioners assert respondents have failed to control the spread of the virus that causes COVID-19 within FCC-Butner, thus exposing them to a substantial risk of contracting the disease.").

In further support of its arguments, the government submitted additional reasons for the court to change its mind -- describing certain pivotal updates postdating Rivera's release from incarceration, all of which, the government submitted, undermined the justifications for his release. According to the motion, given that Rivera had relocated to a housing project in Carolina, a municipality in Puerto Rico that was experiencing higher rates of COVID transmission than Butner at the time, it was evident that Rivera had overstated his concerns about COVID. Based on Carolina's transmission rates, the government further suggested that Rivera would, in fact, be safer if returned to Butner. In a similar vein, the government claimed that Rivera's health conditions were less significant than the court had determined, describing communications between him and his probation officer wherein Rivera stated that his health conditions, because of the various medications he was taking, were "under control" and that he did not need to rush to get health insurance following his release. Given these turns of events, coupled with Rivera's updated vaccination status, the government argued that none of his health risks were sufficiently extraordinary and compelling to warrant release.

Rivera fired back. As relevant here, touching briefly upon the court's jurisdiction to entertain the government's motion, Rivera, in a footnote, stated that he would "assume without

conceding" that the government's motion was appropriate in this case, even though, in his estimation, "it [might] be argued that the government is seeking reconsideration within the sentencing context" and therefore proceeding inappropriately. See United States v. Tanco-Pizarro, 892 F.3d 472, 477 n.1 (1st Cir. 2018) ("[T]here is simply no such thing as a 'motion to reconsider' an otherwise final sentence." (quoting United States v. Ortiz, 741 F.3d 288, 292 n.2 (1st Cir. 2014))). Also of import, Rivera observed that all of the government's arguments, except the one concerning his vaccination status, had already been raised or could have been raised in opposition to his compassionate release motion. In a footnote centering a portion of the government's argument (more on this to come), he remarked that "[t]echnically, [he] could argue that . . . [the vaccination] evidence does not qualify as newly discovered evidence because the government could have learned of it in the exercise of due diligence." However, he characterized that argument as hyper-technical and stated that, assuming his vaccination status would qualify as newly discovered evidence for the purposes of reconsideration, it was still insufficient for altering the court's prior decision. As he saw it, based on the available science at the time, the vaccination in and of itself did not sufficiently obviate the risks he confronted while incarcerated. For support, he pointed to the less than 100% efficacy rate of the shots, the possibility of contracting the

virus after being inoculated but before full immunity had been developed, and the ambiguity surrounding how long any immunity provided by the vaccine might last.

To distill the bulk of his arguments: Rivera contended his medical conditions were sufficiently severe, his rehabilitation record was sufficiently impressive, and -- given the constantly changing nature of COVID rates at Butner, along with the prison's demonstrated inability to keep those in its custody safe -- his circumstances were, in fact, sufficiently extraordinary and compelling for the court to sustain its compassionate release order. Disputing the government's argument to the contrary, he insisted that "[i]n prison, living in close quarters with hundreds of other inmates and coming in contact with staff that comes and goes from the prison, is [] not, as the government suggests, a situation where he [would be] better off."

In response to Rivera's objection, the government did not address Rivera's legal assertions raising the possibility that the motion to reconsider might be barred because it effectively arose from a "sentence." Nor did it address Rivera's contention that the vaccination evidence might not actually constitute newly discovered evidence for the purposes of reconsideration. Instead, the government drilled down on its insistence that the vaccine had eliminated the primary reason for Rivera's early release, thereby necessitating reversal of the compassionate release order. In

doing so, it urged the court to reconsider its order given that the vaccination had occurred while his compassionate release motion was pending. The government did not attempt to explain the relevance of the timing of Rivera's vaccination relative to the government's legal arguments to the court.

About two weeks after this legal sparring ceased, the government, on February 2, 2021, filed a notice with the court seeking a prompt ruling on its reconsideration request and providing updated COVID statistics from Butner and Carolina, Puerto Rico, where Rivera was still residing. Later that day, the court obliged the government's request and issued an order denying the government's motion for reconsideration.

In a short order the court chiefly relied on due diligence grounds as its basis for denying relief. Specifically, the court found that "had the parties exercised due diligence, the evidence regarding [Rivera's] vaccination could have been presented earlier." Similarly disposing of the government's other arguments on reconsideration, the court noted that arguments "regarding the number and timing of [COVID] deaths at [Butner], the nature and risks posed by [Rivera's] medical conditions, the reduced risks posed by [his] medical conditions being under control, and [his] rehabilitation record could have been presented" before the court entered its order granting compassionate release.

Dissatisfied, the government filed a timely notice of appeal challenging the district court's orders granting Rivera's compassionate release motion and denying the government's request for reconsideration. And here we are.

## II. Jurisdiction

Before we can reach the merits of the government's arguments, we must first tackle the jurisdictional hiccups that Rivera identifies in his brief. After all, "[f]ederal courts, as courts of limited jurisdiction, may not presume the existence of subject matter jurisdiction, but, rather, must appraise their own authority to hear and determine particular cases." Watchtower Bible & Tract Soc. of New York, Inc. v. Colombani, 712 F.3d 6, 10 (1st Cir. 2013) (quoting Cusumano v. Microsoft Corp., 162 F.3d 708, 712 (1st Cir. 1998)).

Rivera mounts a two-pronged jurisdictional attack. He first contends that our court lacks jurisdiction over any district court decision granting compassionate release. Next, he takes aim at the government's reconsideration motion, arguing that the district court lacked jurisdiction to take it up in the first instance and that we, in turn, lack any authority to consider it further. We take up Rivera's first jurisdictional challenge and then move on to the next.[10]

_____

[10] We do so with the benefit of jurisdictional arguments debuted by the government in its reply brief which, contrary to

- 18 -

## A. Government Appeals from Compassionate Release

As our rules require,[11] the government, in its opening brief, asserts a jurisdictional hook which it contends authorizes this court to consider its appeal of the district court's compassionate release order, specifically, 18 U.S.C. § 3731.[12] In its reply brief, the government also raised the possibility of jurisdiction under 28 U.S.C. § 1291.[13] Irrelevant are both, says

_____

Rivera's claims of waiver, were still available to the government in order to respond to the jurisdictional challenges Rivera raised in response to its opening brief. See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 5 (1st Cir. 2007) ("Ordinary raise-or-waive rules do not apply with respect to claims that a court lacks subject matter jurisdiction.").

[11] To the extent that Rivera is arguing that the government's jurisdictional statement was insufficiently detailed to pass muster under our rules, we disagree. See Fed. R. App. P. 28(a)(4)(A), (B) ("The appellant's brief must contain . . . a jurisdictional statement, including . . . the basis for the district court's . . . subject-matter jurisdiction, with citations to applicable statutory provisions . . . [and] the basis for the court of appeals' jurisdiction, with citations to applicable statutory provisions . . . ."). The government's brief does assert a jurisdictional basis for this appeal. It is of no moment (to jump ahead) that we ultimately locate our jurisdiction in a statute different from the one the government cites. See Arizona v. Manypenny, 451 U.S. 232, 237, 250 (1981) (finding jurisdiction under 28 U.S.C. § 1291, even though the government had invoked 18 U.S.C. § 3731 in its jurisdictional statement).

[12] 18 U.S.C. § 3731 states, in relevant part, that "[a]n appeal by the United States shall lie to a court of appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release."

[13] 28 U.S.C. § 1291 provides, in relevant part, that "[t]he courts of appeals . . . shall have jurisdiction of appeals from

Rivera:   Notwithstanding what the government claims, it has no right to appeal an adverse ruling granting compassionate release as such appeals may not be brought under either of the limited statutory pathways, cited by the government, that might otherwise authorize a government's criminal appeal.   It follows, so the argument goes, that if the government has no right to appeal then this court lacks the authority to entertain such an appeal.

From our deep dive into this jurisdictional protestation it appears we are the first circuit court to have to confront this question directly; while, to our knowledge, none of our sister circuits have denied their jurisdiction to entertain a government compassionate release appeal, those that have resolved such appeals have seemingly done so without facing a targeted jurisdictional challenge and consequently, without the need to wax loquaciously about the source of their authority to review such a decision adverse to the government.[14]

---

all final decisions of the district courts of the United States . . . ."

[14] The Third and Tenth Circuits have summarily assumed jurisdiction under 28 U.S.C. § 1291. See United States v. Herrera-Genao, No. 21-2345, 2023 WL 2755577, at *2 (3d Cir. Apr. 3, 2023); United States v. Maumau, 993 F.3d 821, 824 (10th Cir. 2021).   The Fourth and Sixth Circuits have exercised jurisdiction without naming its source, in cases where the briefs cited § 1291 and 18 U.S.C. § 3731, and § 1291 and 18 U.S.C. § 3742(b), respectively. See Brief for Appellant at 2, United States v. McCoy, 981 F.3d 271 (4th Cir. 2020) (No. 20-6821), 2020 WL 3958578; Brief for Appellant at 2, United States v. Sweet, 2021 WL 5371402 (6th Cir. Nov. 18, 2021) (No. 21-1477).

Because Rivera squarely raised this jurisdictional issue, we now consider his challenge. First, some fundamentals: "It is common ground that 'appeals by the Government in criminal cases are something unusual, exceptional, not favored.'" United States v. Watson, 386 F.3d 304, 307 (1st Cir. 2004) (quoting Carroll v. United States, 354 U.S. 394, 400 (1957)). Accordingly, "[t]he government has no right of appeal in criminal cases except where a statute expressly grants such a right." United States v. Kane, 646 F.2d 4, 5 (1st Cir. 1981).

With those general principles in the backdrop, Rivera's argument goes like this. First, he says his compassionate release order ought to be understood as a sentencing order, and therefore face the same appealability constraints applied to other sentences. Under this paradigm, grounds for the government to appeal a sentencing decision are generally limited to those enumerated in 18 U.S.C. § 3742(b), the primary statute that governs criminal sentencing appeals. See 18 U.S.C. § 3742(b) (stating that the government may appeal "an otherwise final sentence if the sentence--(1) was imposed in violation of law; (2) was imposed as a result of an incorrect application of the sentencing guidelines; (3) is less than the sentence specified in the applicable guideline range . . . ; or (4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable"). Given the parameters of 18 U.S.C. § 3742(b), Rivera argues, and the

government does not disagree, that none of its provisions apply here.

Continuing, Rivera maintains that with 18 U.S.C. § 3742(b) out of contention, the government, as it argues, is left to rely instead upon either 28 U.S.C. § 1291 or 18 U.S.C. § 3731. But our case law is clear, says Rivera, that neither 28 U.S.C. § 1291 which gives the courts of appeals jurisdiction over final decisions of the district court, nor 18 U.S.C. § 3731 which affords appeal rights from certain district court orders granting release of persons in limited situations, authorizes a government appeal from a sentencing decision. See United States v. Patterson, 882 F.2d 595, 599 (1st Cir. 1989) ("[T]he Court has reaffirmed that the Federal Government enjoys no inherent right to appeal a criminal judgment, and that the grant of general appellate jurisdiction, now contained in 28 U.S.C. § 1291, does not authorize such a federal appeal" (quoting Arizona v. Manypenny, 451 U.S. 232, 246-47 (1981))), abrogated on other grounds by Taylor v. United States, 495 U.S. 575 (1990); id. (holding that § 3731 "cannot be read to include government appeals from sentencing orders."). And since the government finds no other statutory support to ground its appeal, no jurisdiction may lie with this court. As we mentioned, the government disagrees with Rivera's argument.

- 22 -

We begin by observing that in <u>United States</u> v. <u>Trenkler</u>, we considered another government appeal from an order granting compassionate release, thus exercising our jurisdiction over the matter. 47 F.4th 42 (1st Cir. 2022) (vacating and remanding an order granting compassionate release). There, the government, without challenge to the appellate court's jurisdictional underpinning, cited 28 U.S.C. § 1291 as the basis for this court's exercise of jurisdiction over its appeal. Today, we make explicit what in <u>Trenkler</u> we necessarily implied (remember, we police our jurisdiction),[15] as we confirm our jurisdiction over the government's compassionate release appeal. 28 U.S.C. § 1291 grounds our authority and because we so conclude, we need not address, as the government contends, whether 18 U.S.C. § 3731 might also provide a jurisdictional pathway. Here's why.

As an initial matter and as the government's brief points out, Rivera's jurisdictional arguments misinterpret the nature of compassionate release. What they incorrectly take for granted is

_____

[15] In <u>Trenkler</u>, as well as in our cases reviewing compassionate release appeals brought by defendants, we did not expressly state the grounds for our jurisdiction to consider the appeals. However, the briefs for these cases suggest that each of them was brought, at least in part, under 28 U.S.C. § 1291. <u>See</u> Brief for Appellant at 1, <u>United States</u> v. <u>Trenkler</u>, 47 F.4th 42 (1st Cir. 2022) (No. 21-1441); <u>see also</u> Brief for Appellant at iv, <u>United States</u> v. <u>Ruvalcaba</u>, 26 F.4th 14 (1st Cir. 2022) (No. 21-1064), 2021 WL 1249120; Brief for Appellant at 2, <u>United States</u> v. <u>Diaz-Castro</u>, 2022 WL 1415327 (1st Cir. May 3, 2022) (No. 21-1550), 2021 WL 6102766; Brief for Appellant at 7, <u>United States</u> v. <u>Saccoccia</u>, 10 F.4th 1 (1st Cir. 2021) (No. 20-2045), 2021 WL 510580.

the notion that his "sentence-reduction order" (as he describes it) should be treated like a traditional sentencing order. Yet quite the opposite is true -- our analogous precedent has repeatedly distinguished the two and instead concluded that a sentence reduction order is in fact "a horse of a different hue." United States v. McAndrews, 12 F.3d 273, 277 (1st Cir. 1993).

In United States v. McAndrews, we considered this question (original sentencing versus sentencing modification) in our review of a sentence reduction order granted under Federal Rule of Criminal Procedure 35(b). Id. Rule 35(b) authorizes a court to reduce an individual's prison sentence should they provide substantial assistance to the government in investigating or prosecuting another person. Fed. R. Crim. P. 35(b). In McAndrews, the government likened the Rule 35(b) sentence reduction order before us to a downward departure granted during sentencing for providing substantial assistance -- which, at the time, would have been unappealable.[16] 12 F.3d at 277.

---

[16] At the time, "neither refusals to depart nor downward departures" were appealable. McAndrews, 12 F.3d at 277. This changed with the Supreme Court's decision in United States v. Booker, which clarified that courts of appeals are to review sentences for reasonableness. 543 U.S. 220 (2005). We have since held that, "[a]s a by-product" of Booker, we review "sentences shaped by discretionary departure decisions" for reasonableness. United States v. Anonymous Defendant, 629 F.3d 68, 73-74 (1st Cir. 2010).

We disagreed, instead concluding that the attempted analogy was "unpersuasive in connection with appellate jurisdiction," given that "an order resolving a Rule 35(b) motion . . . is not, properly speaking, a sentence." Id. at 277-78. First, we observed that "[b]y definition, a sentence must already have been imposed before Rule 35(b) can be invoked and a sentence reduction contemplated." Id. at 277. From there, we reasoned that "[c]ast in this mold," appealability "accords with the general principle, taken for granted in both our criminal and civil jurisprudence, that rulings disposing of motions which seek to alter preexisting judgments are appealable." Id.

Rivera's jurisdictional challenge does not raise, nor do we discern, any reason why his compassionate release order breaks this mold. Like sentence reductions requested under Rule 35(b), compassionate release motions, by definition, may only be brought after a sentence has been imposed on the movant. See 18 U.S.C. § 3582(c) (establishing the terms by which a court may "modify a term of imprisonment once it has been imposed"). And like Rule 35(b) motions, they seek to alter a preexisting judgment -- to wit, the sentence. Id.

Such reasoning satisfies us that Rivera's compassionate release order does not amount to a sentence,[17] and accordingly, we

_____

[17] We also read the Supreme Court's decision in Dillon v. United States to support this conclusion. See 560 U.S. 817 (2010).

- 25 -

follow the lead of McAndrews and conclude that compassionate release appealability, "like appealability with respect to the disposition of virtually all other post-judgment motions, is governed by 28 U.S.C. § 1291." 12 F.3d at 277. Orders resolving compassionate release motions amount to final judgments; like sentence reduction orders granted under Rule 35(b), they "satisf[y] the preconditions established by section 1291, for entry of the order leaves nothing further to be done." Id.[18]

---

While reviewing a different provision of 18 U.S.C. § 3582(c)(2), the Dillon Court concluded that the statute's "text, together with its narrow scope, shows that Congress intended to authorize only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding." Id. at 826. Although that provision is narrower than § 3582(c)(1) (which is at issue here), we find the Court's distinction between a "limited adjustment" and a "plenary resentencing" instructive.

[18] We pause to address our precedential caution that "[i]n criminal cases, the policy against permitting [government] appeals to be taken too freely is heightened by speedy trial and double jeopardy concerns." United States v. Horn, 29 F.3d 754, 768 (1st Cir. 1994). These concerns do not apply here. Individuals who receive compassionate release have already been convicted of a criminal offense, so there is no risk that authorizing government appeals would deny them a prompt trial by dragging out their criminal proceedings. In such cases, "the determination of the defendant['s] guilt has been made, [the] sentence has been imposed, the attempted appeal is not interlocutory in any sense, and no prospect of piecemeal litigation endures." Id. at 768-69. And as individuals already convicted of a criminal charge, those granted compassionate release do not face constitutional risks under the Double Jeopardy Clause of the Fifth Amendment, which "forbids the retrial of a defendant who has been acquitted of the crime charged." Bullington v. Missouri, 451 U.S. 430, 437 (1981) (emphasis in original); see U.S. Const. amend. V ("No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb . . . .").

- 26 -

Concluding that we have jurisdiction over the government's compassionate release appeal under 28 U.S.C. § 1291,[19] we move on to Rivera's second set of jurisdictional challenges, which target the district court's authority, as well as ours, to consider the government's reconsideration bid.

## B. The District Court's Reconsideration Decision

Like Rivera's other jurisdictional arguments, his challenge to the district court's authority to reconsider its compassionate release decision assumes that the order amounts to a sentence. Following this reasoning, the government's motion would likely have been barred because, under this court's precedent, "[t]here is simply no such thing as a 'motion to reconsider' an otherwise final sentence." Tanco-Pizarro, 892 F.3d at 477 n.1 (quoting Ortiz, 741 F.3d at 292 n.2). But given our analysis above, which distinguishes compassionate release and other sentence reduction orders from sentencing orders, this is clearly a nonstarter.

---

[19] For this reason, we need not consider the government's arguments seeking to characterize compassionate release orders as "collateral orders" potentially eligible for jurisdiction under § 1291 on this other ground. See Horn, 29 F.3d at 768-69 (holding that, under the "special circumstance exception, a government appeal may be entertained in a criminal case on the authority of section 1291 if the appeal satisfies the conditions of the so-called collateral order doctrine" and prudential considerations do not counsel against authorizing the government's criminal appeal).

We agree with Rivera -- 18 U.S.C. § 3582(c) has set strict constraints on the authority of a sentencing court to modify a sentence after it has been imposed. See 18 U.S.C. § 3582(c) (listing limited exceptions, such as compassionate release, to the general rule that a "court may not modify a term of imprisonment once it has been imposed"). However, because we do not regard the district court's compassionate release as a sentence, we do not question its authority to reconsider the order. As the government points out, no statutes similarly bar a district court from returning to its previously issued sentence reduction order. In this absence, we observe no comparable limits to the "inherent authority" of the district courts, after resolving compassionate release motions, "to revisit their own orders" on reconsideration. Ortiz, 741 F.3d at 292 n.2. Therefore, we find the district court's exercise of jurisdiction over the government's reconsideration motion proper.[20]

---

[20] We are skeptical of Rivera's contention that allowing the district court to reconsider an order granting compassionate release could open the door to disturbing the release of hundreds of individuals whose motions have been granted. As the Tenth Circuit has observed, "[t]he Federal Rules of Criminal Procedure do not authorize motions for reconsideration and accordingly do not specify a time within which they must be brought." United States v. Heath, 846 Fed. App'x 725, 728 (10th Cir. 2021). However, given that the Supreme Court has recognized motions for reconsideration in the criminal context since at least 1964, see United States v. Healy, 376 U.S. 75, 77-78 (1964), several circuit courts have imposed time limits on motions for reconsideration to avoid the possibility of proceedings continuing indefinitely, see United States v. Randall, 666 F.3d 1238, 1242 (10th Cir. 2011)

We also reject Rivera's suggestion that we lack jurisdiction over the government's appeal from its reconsideration denial. Because 28 U.S.C. § 1291 authorizes our review of the government's appeal from a compassionate release order, the statute similarly affords us jurisdiction over the government's reconsideration appeal. Like appealability with respect to the disposition of virtually all other post-judgment motions, reconsideration denial falls within the purview of 28 U.S.C. § 1291 finality considerations. See McAndrews, 12 F.3d at 277. The court's reconsideration denial leaves "nothing further to be done," placing it in the company of other final judgments appealable under § 1291. Id.

With our jurisdiction to review the government's appeal under 28 U.S.C. § 1291 confirmed, we soldier on.[21]

---

(agreeing with the Fourth and Seventh Circuits that the time limit for reconsideration is the same as the time limit for filing an appeal); see also United States v. Wandell, No. 21-3051, 2022 WL 1535276, at *1 (3d Cir. May 16, 2022) (discussing same 14-day deadline for motion to reconsider compassionate release denial). We have not adopted such a deadline and decline to do so today, given that the government here filed the motion within days of the district court's decision. We merely note that there are very likely guard rails on the government's ability to move for reconsideration long after a motion for compassionate release has been granted.

[21] To tie up one jurisdictional loose end, we note that 18 U.S.C. § 3742(b) remains inapplicable to this appeal. As the government concedes, McAndrews suggests that compassionate release appeals, like Rule 35(b) reduction appeals, are "not controlled by 18 U.S.C. § 3742 because such [orders are] not, properly speaking, [sentences]." McAndrews, 12 F.3d 277. Therefore, we need not consider Rivera's arguments that the government did not present

### III. Motions for Compassionate Release

Before assessing the merits of the government's contentions, we detour briefly to provide an overview of compassionate release and the statutory framework that governs it. 18 U.S.C. § 3582(c), the compassionate release statute, provides limited circumstances under which a court may reduce an incarcerated person's term of imprisonment. Under the provision relevant here, a district court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--extraordinary and compelling reasons warrant such a reduction . . . ." 18 U.S.C. § 3582(c)(1)(A)(i).[22]

---

sufficiently specific and timely authorization from the Department of Justice before pursuing this appeal. While § 3742(b) requires such authorization, see 18 U.S.C. § 3742(b) ("The Government may not further prosecute such appeal without the personal approval of the Attorney General, the Solicitor General, or a deputy solicitor general designated by the Solicitor General."), 28 U.S.C. § 1291 does not. See 28 U.S.C. § 1291.

[22] 18 U.S.C. § 3582(c)(1)(A) also requires the sentence reduction to be "consistent with applicable policy statements issued by the Sentencing Commission." Our case law has clarified that, because (up until recently) the Commission had not issued any policy statements applicable to prisoner-initiated motions for compassionate release, district courts "have discretion, unconstrained by any policy statement currently in effect, to consider whether a prisoner's particular reasons are sufficiently extraordinary and compelling to warrant compassionate release." Ruvalcaba, 26 F.4th at 23. We recognize that many of these compassionate release motions, like Rivera's, came before the courts during a worldwide health crisis -- a time of great uncertainty, even to the medical and health community. In the time since, the Sentencing Commission has promulgated new guidelines relevant for compassionate release motions, which we

Successful movants for compassionate release under this section must generally meet three requirements. First, their request must be properly raised, either "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after" they have tried and failed to convince the BOP to move on their behalf.[23] Id. Second, they must present sufficiently "extraordinary and compelling reasons" warranting a sentence reduction. Id. And finally, they must convince the court that, after considering the sentencing factors enumerated in 18 U.S.C. § 3553(a), "the reduction . . . is warranted in whole or in part under the particular circumstances of the case." United States v. Ruvalcaba, 26 F.4th 14, 19 (1st Cir. 2022) (quoting United States v. Saccoccia, 10 F.4th 1, 4 (1st Cir. 2021) (omission in original)). These § 3553(a) factors, which any court must consider

expect district courts to take heed of when determining whether an individual meets the statute's requirements for such relief. See Amendments to the Sentencing Guidelines, U.S. Sentencing Commission (Apr. 27, 2023), https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023.

[23] "The passage of the [First Step Act] in 2018 represented 'a paradigm shift' for compassionate release '[b]y empowering district courts to grant compassionate release' on prisoner-initiated motions." Trenkler, 47 F.4th at 46 (quoting Ruvalcaba, 26 F.4th at 22). Prior to the Act's amendment to the compassionate release statute, motions could only be brought by the BOP on behalf of incarcerated people. Under the amended statute, individuals may file their own motions with the district court if they have asked the BOP and either waited 30 days or exhausted their administrative rights to appeal a BOP denial. 18 U.S.C. § 3582(c)(1)(A).

when imposing or modifying a criminal sentence, generally revolve around the nature and characteristics of the offense, the defendant, and the sentence imposed relative to both.[24] 18 U.S.C. § 3553(a).

If a court determines that a movant meets the statute's requirements, it may order their release from prison. In place of the unserved portion of the defendant's sentence, the court may also impose a term of supervised release or probation. 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)."). "As long as the individualized circumstances, taken in the aggregate, satisfy the 'extraordinary and compelling' standard, granting relief would be consistent with Congress's judgment that a modification of a sentence legally imposed may be warranted when extraordinary and compelling reasons for taking that step exist."

---

[24] For example, 18 U.S.C. § 3553(a) requires a sentencing court to consider, among other delineated factors, "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a).

Ruvalcaba, 26 F.4th at 27 (citing United States v. McCoy, 981 F.3d 271, 288 (4th Cir. 2020)).

Here, the court concluded that Rivera met the conditions for compassionate release and reduced his prison term to time served while imposing additional supervised release conditions (home detention and electronic monitoring for the first three years of his five-year term). On appeal, the government sees multiple problems with these determinations, as well as the court's refusal to reconsider its compassionate release decision.

## IV.  Our Take

Given the procedural posture of this case, we deem it prudent to begin our discussion with the government's challenges to the court's order denying reconsideration because, were we to agree with the government that the district court somehow faltered in denying the government's motion (we don't), our analysis would likely end there, and we would remand the case back to the district court for further consideration.

### A.  The Government's Reconsideration Denial

To recap for clarity, Rivera's compassionate release motion required him to demonstrate that he presented extraordinary and compelling reasons justifying a sentence reduction and that the reduction was warranted even after considering the § 3553(a) sentencing factors. See 18 U.S.C. § 3582(c)(1)(A). In opposition, the government argued that Rivera failed on both accounts. After

losing, the government urged the court to reconsider based on newly discovered evidence and on newly raised arguments. The court declined to do so after finding that (1) had the parties exercised due diligence, the government's key piece of new evidence -- Rivera's vaccination status -- could have been presented earlier, and (2) the rest of the government's arguments could have also been presented prior to Rivera's release.

We begin by stating an uncontroversial principle: Once a court has issued a ruling based upon the facts and arguments presented by the litigants, it becomes final. See United States v. Metro. Dist. Comm'n, 847 F.2d 12, 14 (1st Cir. 1988) ("The general rule is that a judgment becomes final . . . when the court enters a decision resolving the contested matter, leaving nothing to be done except execution of the judgment."). Accordingly, motions for reconsideration are granted sparingly, and we pay high deference to a court's refusal to disturb a prior final judgment by granting one. See Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 37 (1st Cir. 2013) ("Finality is an important element in the judicial process, and setting aside a final judgment requires more than the frenzied brandishing of a cardboard sword. Such a motion must satisfy a special set of criteria; it is not enough merely to cast doubt on the soundness of the underlying judgment."). Therefore, we review the court's denial of the government's motion for abuse of discretion. Guadalupe-Báez v.

_Pesquera_, 819 F.3d 509, 518 (1st Cir. 2016). Historically, we have found as much "only when 'the original judgment evidenced a manifest error of law, if there [was] newly discovered evidence, or in certain other narrow situations." _Biltcliffe_ v. _CitiMortgage, Inc._, 772 F.3d 925, 930 (1st Cir. 2014) (quoting _Global Naps, Inc._ v. _Verizon New England, Inc._, 489 F.3d 13, 25 (1st Cir. 2007)).

As an asterisk to this list, we have noted that a court may refuse reconsideration requests "based on the 'new evidence' exception if that evidence 'in the exercise of due diligence could have been presented earlier.'" _United States_ v. _Allen_, 573 F.3d 42, 53 (1st Cir. 2009) (quoting _Emmanuel_ v. _Int'l Bhd. of Teamsters, Local Union No. 25_, 426 F.3d 416, 422 (1st Cir. 2005)). Because arguments stemming from such evidence could have been raised before the court issued its underlying judgment, they may not be raised for the first time on reconsideration. See _Morán Vega_ v. _Cruz-Burgos_, 537 F.3d 14, 18 n.2 (1st Cir. 2008) ("A district court is entitled to disregard arguments made in a [motion for reconsideration] that 'could, and should, have been made before judgment issued.'") (quoting _ACA Fin. Guar. Corp._ v. _Advest, Inc._, 512 F.3d 46, 55 (1st Cir. 2008)).

On appeal, the thrust of the government's reconsideration grievances boils down to two particular types of alleged error:  the failure of the district court to consider new

evidence and its failure to accept and appreciate new arguments that it characterizes as identifying "manifest errors" in the district court's release decision.  We take each in turn.

### 1.  Newly Discovered Evidence

### Rivera's Vaccination Status

On appeal, the government argues that the court abused its discretion when it concluded that, had due diligence been exercised, evidence of Rivera's vaccination could have been presented before Rivera's compassionate release was granted.  The government says this was prejudicial error because Rivera, himself, had declined to make this particular argument.  As the government sees it, Rivera took this line of reasoning off the table when, as we previously mentioned, he opted, in his opposition to reconsideration, to "assume for the sake of argument this [vaccination] evidence is newly discovered within the meaning of the standard for motions for reconsideration[.]"[25]  As the

---

[25] To remind, in a footnote to Rivera's opposition to reconsideration, his counsel stated:

> Technically, we could argue that since Mr. Rivera received the second shot three days before the Court's release order, this evidence does not qualify as newly discovered evidence because the government could have learned of it in the exercise of due diligence.  But we are not going to be hyper-technical because the fact is that even the undersigned attorney was not aware that Mr. Rivera had been vaccinated.  Thus, we will assume for the sake of argument that this evidence is newly discovered within the meaning of the standard for

government's reasoning goes, the district court, by still finding that the evidence did not fall within this meaning, inappropriately "resurrected" an issue Rivera had otherwise waived. In doing so, the court prejudiced the government -- which had been led to believe there was "little reason" to make its due diligence case.

"[D]ue diligence is a context-specific concept" that requires a movant to "exercise a degree of diligence commensurate with that which a reasonably prudent person would exercise in the conduct of important affairs." United States v. Maldonado-Rivera, 489 F.3d 60, 69 (1st Cir. 2007). "Where timeliness hinges on the presence or absence of due diligence . . . it raises 'a normative question of how much diligence should be expected of a reasonable lay person.'" Meléndez Colón v. Rosado Sánchez, 995 F.3d 262, 267 (1st Cir. 2021) (quoting Villarini-Garcia v. Hosp. Del Maestro, Inc., 8 F.3d 81, 84 (1st Cir. 1993)). Accordingly, we understand due diligence to be a "mixed" question of fact and law, because its resolution "necessitate[s] combining factfinding with an elucidation of the applicable law." In re Extradition of Howard, 996 F.2d 1320, 1328 (1st Cir. 1993). We review such mixed questions on a "degree-of-deference continuum," wherein "the more fact-dominated the question, the more likely it is that the trier's

motions for reconsideration, but insist that it is insufficient to alter the outcome.

resolution of it will be accepted unless shown to be clearly erroneous."  Id.

However, we need not pinpoint what precise standard to apply to the district court's reasoning here because, after considering the government's argument, we conclude it suffers from a fundamental flaw.[26]  It made no attempt whatsoever to meet its legal burden when it sought reconsideration, as we now explain.

In order to secure reconsideration, as we noted, a "movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law."  Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).  Here, the government's burden was to convince the court that Rivera's vaccination status, which it contends had just come to light, constituted such evidence.  Our precedent has repeatedly clarified the scope of this burden, cautioning that "a party who seeks relief from a judgment based on newly discovered evidence must, at the very least, offer a convincing explanation as to why he could not have proffered the crucial evidence at an earlier stage of the proceedings."  Karak v. Bursaw Oil Corp., 288 F.3d 15, 19-20 (1st Cir. 2002); see also Lepore v. Vidockler, 792 F.2d 272, 274 (1st

---

[26] For this reason, we do not address the government's arguments urging us to find that a de novo standard should control our review of the district court's due diligence analysis in this case.

Cir. 1986) ("It is difficult to see how the district court abused its discretion [in denying a motion to reconsider] when [the movant] offered no explanation for the lateness of the [new] affidavits."). Thus, the government, as the reconsideration movant, bore the burden of demonstrating in its initial reconsideration filing the existence of newly discovered evidence and, as crucial here, why that evidence, if alleged to be newly discovered, could not have been discovered earlier in the exercise of due diligence. Despite this burden, the government's reconsideration motion made no effort to explain why Rivera's vaccination status could not have been presented earlier. It raised no argument at all that due diligence had been exercised and provided no reason for the delay in discovering this information. Instead, even before Rivera filed an objection making mention of what the government took for granted, the government's reconsideration motion disregarded its burden and proceeded on the assumption that the vaccination evidence qualified as newly discovered.

Therefore, we cannot and do not fault the court for concluding, in the absence of a proffer from the government to the contrary in its filings, that the evidence could have been presented earlier. And Rivera's failure to provide substantive arguments on this issue when he opposed reconsideration did not waive the government's burden of proof, nor foreclose the court's

ability to scrutinize whether, in its view, it had been met.[27]  In fact, Rivera's opposition directly contended (but declined to fully argue) that the burden had not been met, and that due diligence would have yielded this evidence earlier.  Accordingly, the government's motion for reconsideration (and subsequent reply) offered clear opportunities to demonstrate that due diligence could not have yielded Rivera's vaccination status, or to refute Rivera's abbreviated claim to the contrary.  As we see it, our case law, alongside Rivera's contention, provided ample notice to the government that a due diligence tender would have been reasonably expected *ab initio*.[28]  And contrary to the government's

---

[27] Similarly, we are not barred from relying on this ground to affirm the district court's due diligence finding, even though Rivera's brief presents entirely distinct arguments on this issue. Rivera insists that the government failed to exercise due diligence in monitoring his vaccination status, and further suggests that, either way, we may infer that the district court had concluded the vaccine would not eliminate his health risks.

Because we are not confined to the reasoning provided by either party as we review the district court's decision, we affirm on the grounds stated above and decline to consider Rivera's alternative reasons for affirming. See ML-CFC 2007-6 Puerto Rico Properties, LLC v. BPP Retail Properties, LLC, 951 F.3d 41, 46 (1st Cir. 2020) ("That neither of the parties developed this argument [in their initial briefs] . . . does not prevent us from ruling on this basis."); Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

[28] Because Rivera's contention squarely raised, albeit briefly, the due diligence issue before the court, we are also confident that the court did not, as the government argues in its brief, violate the party presentation principle by considering due

assertions, which lack legal support within our case law, the district court was not required to overlook the government's omission and view the government's moving papers as still compliant with its dual burdens to first produce and then persuade. Any blame for the government's failure to make its case below lies with it, not with Rivera or with the court.

Therefore, we see no error, nor prejudice, in the court's due diligence finding. Moreover, we will not consider due diligence arguments the government now raises for the first time

diligence when it ruled. Broadly, the principle refers to the fact that, in litigation, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." Greenlaw v. United States, 554 U.S. 237, 243 (2008). The government reasons that the court overstepped its role here, and therefore violated the principle, by ruling on due diligence grounds that Rivera had "deliberately waived."

However, the court's actions below are entirely distinct from those held to be violations of the principle by the Supreme Court. In those cases, unlike here, the offending courts had sua sponte raised, and ruled on, issues that neither party had mentioned. See United States v. Sineneng-Smith, 140 S. Ct. 1575 (2020) (rejecting a court's decision to order amicus briefs on, and ultimately rule based on, a constitutional legal theory that was not part of the appellant's arguments below nor in the district court); Wood v. Milyard, 566 U.S. 463 (2012) (reversing a court's decision to dismiss a habeas petition on statute of limitations grounds after the court sua sponte raised the issue and the government still expressly declined to argue the affirmative defense); Greenlaw, 554 U.S. at 255 (vacating court of appeals decision to sua sponte order a sentence increase in response to a defendant's unsuccessful appeal, in the absence of a cross-appeal by the government). We are satisfied that this distinction provides at least one basis for concluding that the principle was not violated here.

on appeal.[29]  See Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 59 (1st Cir. 2021) ("[A]ppellants cannot raise an argument on appeal that was not 'squarely and timely raised in the trial court.'") (quoting Thomas v. Rhode Island, 542 F.3d 944, 949 (1st Cir. 2008)).

## Rivera's Post-Release Actions

Independent of its first argument, the government also challenges the district court's treatment of two additional pieces of "newly discovered evidence" -- gamechangers from the government's perspective -- introduced in its reconsideration motion, both of which post-date the district court's January 8th order and thus could not have been raised earlier.  As noted previously, each evidentiary offering concerned occurrences following Rivera's release from Butner.  To remind, the first was Rivera's conversation with his probation officer during which he shared that he had not had any health issues recently, his medical conditions were all "under control," and he did not need to prioritize getting medical insurance.  The second was Rivera's post-release relocation to Carolina, Puerto Rico, where the COVID infection rate, according to the government, was "greater than

---

[29] These arguments, which should have been presented to the district court, center on the relatively early timing of Rivera's vaccination, the unpredictable timing of the district court's compassionate release decision, and the logistical burdens prosecutors face in accessing an incarcerated person's medical records.

- 42 -

[Butner's] by a factor of 24.66--i.e., Carolina's infection rate [was] 2,465 percent greater than his prison's." As the government tells it, this evidence suggests that Rivera, in his motion for compassionate release, had necessarily overstated his medical concerns and his fear of contracting COVID in prison.

The district court did not expressly address either of these proffers when it denied the government's motion. Rather, it cited its broad authority to disregard new evidence that could have been discovered in the exercise of due diligence, and, nodding to Rivera's health-related disclosures, held, as crucial here, that the government's specific arguments regarding "the reduced risks posed by [Rivera's] medical conditions being under control" could have been presented prior to the court's compassionate release decision. The government says this was error, as no amount of due diligence could have led it to anticipate Rivera's post-release statements and behavior. According to the government, Rivera's relocation to Puerto Rico defied his stated plan to reside in the continental U.S. after his release (which the government seems to assume had lower transmission rates, like Butner did at the time), and his prison medical records provided alongside his compassionate release motion made no indication that his health conditions were under control.

In our view, the government's grievances misunderstand the district court's holding. As we interpret the court's decision

it is apparent it had concluded that, regardless of Rivera's post-release representations and actions, the government, at the time it objected to Rivera's compassionate release motion, had ample information at its disposal about Rivera's health and conditions at Butner to make an informed and rational argument about why compassionate release was unwarranted. From the court's perspective, it did not do so. And while the government makes much of Rivera's medical musings to his probation officer to suggest otherwise, this argument ignores the reality that the government was at liberty to independently access and, as importantly, assess Rivera's medical records when it opposed Rivera's compassionate release in the first instance, particularly when Rivera's health status and COVID's impact on the same was squarely before the court. Because motions for reconsideration do not "permit a party to advance arguments it should have developed prior to judgment," Biltcliffe, 772 F.3d at 930, we fail to see how the court, even if it considered this evidence, abused its discretion in discounting the evidence and the arguments that flow from it. As for Rivera's post-release relocation to Carolina, we simply infer that even if the court was willing to give some consideration to this new circumstance it was unmoved by it and concluded that it was insufficient to alter its compassionate release calculus. See Bennett v. Saint-Gobain Corp., 507 F.3d 23, 35 (1st Cir. 2007) (affirming denial of reconsideration where newly

raised evidence, even if considered, "would not have affected the bottom-line result").  We see no abuse of discretion.

## 2. Newly Raised Arguments

Up next, the government challenges the district court's refusal to consider its reconsideration arguments taking aim at what, in its view, were "manifest errors" of law (distinct from errors arising from evidentiary concerns) committed by the court when it granted Rivera compassionate release.  We take this argument to mean that even if the district court properly declined to consider newly discovered evidence, it nonetheless erred by not properly applying the relevant compassionate release jurisprudence to the evidence at hand.

On appeal, the government argues that the court's conclusion was an abuse of discretion.  In its reconsideration motion, and now on appeal, the government claims that its arguments concerning Butner's safety and Rivera's health conditions were raised not to shift arguments, but instead to correct manifest errors in the district court's compassionate release decision. For instance, the government charges that the district court, in granting Rivera's motion for compassionate release, "had misunderstood the significance of the number of inmates in Rivera's prison who had died from COVID-19" and had clearly erred when it found that Rivera's conditions increased his risk of severe illness from the virus.  Pushing back on the court's conclusion that its

arguments should have been raised before the court had issued its compassionate release order, the government notes that "[a] litigant cannot point out an error until it occurs."

In its ruling the court, acknowledging its authority to "disregard arguments made in a [motion for reconsideration] that 'could, and should, have been made before judgment issued,'" summarily refused to consider what it deemed to be newly raised legal challenges.  See Morán Vega, 537 F.3d at 18 n.2 (quoting ACA Fin. Guar. Corp., 512 F.3d at 55).  It did so after reasoning that the government's arguments -- "regarding the number and timing of COVID-19 deaths at [Rivera's] institution, the nature and risks posed by [Rivera's] medical conditions, [and] the reduced risks posed by [Rivera's] medical conditions being under control" -- could have been presented before Rivera's release was ordered.

As we consider the government's contentions we note that while it may be true that "a litigant cannot point out an error until it occurs," the government's reconsideration arguments go far beyond pointing out error by the court.  Rather, they raise a new set of arguments -- entirely distinct from those made by the government in its opposition to Rivera's compassionate release motion -- that present new grounds as to why it believes Rivera's release was not warranted.  We conclude as much after reviewing the government's opposition to Rivera's compassionate release request alongside its subsequent motion to reconsider.  Between

- 46 -

the two filings, the government's take on the COVID conditions at Butner and its arguments concerning Rivera's health conditions transformed markedly. Even though Rivera's compassionate release motion presented reasons why he believed the poor pandemic conditions at Butner, specifically, helped make his case for release, the government's opposition was unresponsive to these points. Instead and at most, it emphasized the broader COVID mitigation measures taken throughout the BOP and argued that Rivera had not shown that his facility (which the government, naming a different federal prison, misidentified) was "unequipped to provide appropriate medical treatment if he were to become sick." And it further argued that Rivera's health conditions were insufficient for compassionate release because they failed to meet the definition of "extraordinary and compelling reasons" presented by the U.S. Sentencing Commission in its policy statement associated with U.S. Sentencing Guideline § 1B1.13.[30]

---

[30] Quoting the statement directly, the government urged denial based on the fact that Rivera did "not explain how any of [his] conditions, or their combination, in any way limit his ability to provide self-care within the correctional facility." See U.S.S.G. § 1B1.13 cmt. n.1(A)(ii) (including, in a list of extraordinary and compelling reasons for compassionate release, medical conditions "that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."). At the time of the filing, there was significant disagreement about whether district courts were bound by this policy statement when considering compassionate release motions brought directly by incarcerated movants. In Ruvalcaba, which was

These initial points, made in opposition to Rivera's release request, bear little resemblance to the government's arguments on reconsideration. Suddenly, the government was armed with a bevy of arguments centered on its belief that Butner, specifically, was in fact much safer than Rivera's compassionate release motion had suggested. Similarly, the reasons why the government did not believe Rivera's circumstances were extraordinary and compelling seem to have dramatically shifted. Moving away from the sentencing guideline policy statement, the government's arguments shifted to much more targeted critiques of Rivera's health conditions -- primarily arguing that his obesity was both mild and recently acquired and that, according to several courts, CDC guidelines do not consider hypertension or pre-diabetes as risk multipliers with COVID. See, e.g., United States v. Manning, 5 F.4th 803, 807 (7th Cir. 2021) (noting that pre-diabetes "is not recognized by the CDC as increasing a person's risk from" COVID); United States v. Howard, 488 F. Supp. 3d 1177, 1181 (M.D. Ala. 2020) (stating that, per the CDC, hypertension "may increase" an individual's risk of severe illness from COVID).

The government had ample opportunity to speak to the pandemic conditions at Butner, as well as the purportedly minor nature of Rivera's health conditions and their relationship to

decided after the district court's rulings in this case, we determined that they were not. 26 F.4th at 23.

COVID, prior to the court's issuance of its release decision. Having opted to eschew these potential arguments in favor of other ones when it opposed Rivera's release in the first instance, the government may not deploy them for the first time on reconsideration. See Iverson v. City Of Bos., 452 F.3d 94, 104 (1st Cir. 2006) ("The presentation of a previously unpled and undeveloped argument in a motion for reconsideration neither cures the original omission nor preserves the argument as a matter of right for appellate review."). We cannot conclude that the government was at liberty to raise these substantively new arguments on reconsideration under the banner of correcting "manifest errors" by the court. See Biltcliffe, 772 F.3d at 930 ("A motion for reconsideration is not the venue to undo procedural snafus or permit a party to advance arguments it should have developed prior to judgment."). Accordingly, we see no abuse of discretion and affirm the district court's denial of the government's motion for reconsideration.

## B. Rivera's Compassionate Release

We turn now to the district court's compassionate release decision without regarding the government's supplemental proffer, and confine our review to the arguments and evidence before the court at the time it granted Rivera's compassionate release motion. In its ruling, the court granted compassionate release after concluding that "[t]he number of COVID-19 deaths at

[Rivera's] facility, along with [his] medical conditions, qualify as extraordinary and compelling reasons justifying a sentence reduction." Noting Rivera's rehabilitation record and the amount of his sentence that had already been served, the court referenced the § 3553(a) sentencing factors by concluding that "a modified sentence would still reflect the seriousness of [his] offense, promote respect for the law, and provide just punishment for [his] offense."

In its appeal, the government challenges the court's holdings and urges us to reverse the court's grant. Given the discretionary nature of compassionate release, we apply an abuse of discretion standard as we review the court's findings as to Rivera's extraordinary and compelling reasons for compassionate release and whether the § 3553(a) sentencing factors supported release. Saccoccia, 10 F.4th at 4 (noting that "[a]t both steps of this pavane, our standard of review," for abuse of discretion, "is the same"). Under this standard, "we review the district court's answers to legal questions de novo, factual findings for clear error, and judgment calls with some deference to the district court's exercise of its discretion." Id. (quoting Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020)).

### 1. Extraordinary and Compelling Reasons

The government maintains that Rivera has failed to demonstrate extraordinary and compelling reasons sufficient for

compassionate release, and claims that the court committed clear error when it concluded otherwise.  The burden here is high, as "[o]n clear error review, we will 'not . . . upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'"  United States v. Padilla-Galarza, 990 F.3d 60, 73 (1st Cir. 2021) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

Before us, the government raises challenges to each aspect of the court's reasoning on its compassionate release decision.  First, it argues that the court overstated the dangers at Butner -- claiming that it was error to act "upon Rivera's rhetoric about his prison's COVID-19 infection rate instead of actual evidence of its exceptionally low COVID-19 infection rate." Next, the government suggests that Rivera's health conditions, even assuming he was unvaccinated, did not pose a sufficient risk to warrant release.  Specifically, the government contends that Rivera's obesity was too recent and too moderate to favor release, and that hypertension and pre-diabetes do not raise health risks associated with COVID to the degree necessary for release. Finally, understanding the court to have overly relied on Rivera's rehabilitation as another extraordinary and compelling reason to

release him, the government argues that the court overstated his progress when it highlighted the accomplishments in his record.[31]

All of these arguments suffer a defect that we have already identified above as fatal: as Rivera points out, they are not the grounds on which the government initially opposed his compassionate release. None of these arguments surfaced prior to the government's reconsideration request, including the government's arguments critiquing Rivera's rehabilitation record -- which was not addressed at all in the government's opposition to Rivera's motion. "When a party makes an argument for the first

---

[31] After identifying Rivera's extraordinary and compelling reasons for release, and before assessing the § 3553(a) factors, the court stated:

> [Rivera's] record while serving his sentence suggests he has made great progress towards rehabilitation: (1) only one minor disciplinary infraction that occurred almost 10 years ago for being unsanitary and untidy; (2) has devoted a significant amount of time on educational and personal development programming (800 hours of English as a second language, 180-hour vocational program for custodial maintenance, drug abuse education, non-residential drug abuse program, and several other classes[]); and (3) [Rivera] has worked at the UNICOR Optics factory at the FCI Butner complex and as an orderly, and received positive letters of recommendation from his supervisors.

While we read the court's order to be presenting this rehabilitation record in support of the requisite § 3553(a) analysis, we pause to note that no statute prohibits rehabilitation, when combined with other extraordinary and compelling reasons, from serving as one of a court's bases for granting compassionate release. See 28 U.S.C. § 944(t) (stating that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for granting a sentence reduction) (emphasis added).

time in a motion for reconsideration, the argument is not preserved for appeal." Dillon v. Select Portfolio Servicing, 630 F.3d 75, 80 (1st Cir. 2011).

While the government might still have requested, at least in the alternative, that we consider these arguments in search of plain error below, it did not. See United States v. Jimenez, 512 F.3d 1, 3 (1st Cir. 2007) ("Because the appellant raises the issue . . . for the first time on appeal, our review is for plain error."). The government waived any arguments it might have in this regard "by failing to address the governing standard of plain error review in [its] opening brief." United States v. Espinoza-Roque, 26 F.4th 32, 36 (1st Cir. 2022). See also United States v. Pabon, 819 F.3d 26, 33 (1st Cir. 2016) ("At most, we review the remainder of [Appellant's] challenges for plain error. [Appellant] has waived these challenges because he has not even attempted to meet his four-part burden for forfeited claims . . . ."). In the absence of any additional arguments challenging the court's determination that extraordinary and compelling reasons warranted Rivera's release, we observe no abuse of discretion on this finding.

### 2. The Sentencing Factors

Finally, we examine the district court's conclusion challenged by the government that Rivera's release was appropriate

in light of the § 3553(a) sentencing factors.[32]  The government separately argues that, even if Rivera demonstrated the requisite extraordinary and compelling circumstances required for compassionate release, these § 3553(a) factors still counsel against the district court exercising its discretionary authority to release him.  As the government sees it, the district court inappropriately weighed the sentencing factors when it concluded otherwise -- giving disproportionate weight to Rivera's rehabilitation record at the expense of other factors, such as the importance that his sentence reflects the seriousness of his offense, avoids sentencing disparities, promotes general deterrence, and promotes respect for the law.  See 18 U.S.C. § 3553(a)(2), (6).

But let us pause to rehearse what is axiomatic. "Decisions [that involve weighing the § 3553(a) factors] are within the sound discretion of sentencing courts, and we 'will not disturb a well-reasoned decision to give greater weight to particular sentencing factors over others.'"  United States v. Santini-Santiago, 846 F.3d 487, 492 (1st Cir. 2017) (quoting United States

_____

[32] Rivera contends that the government has waived its challenge to the court's weighing of the § 3553 sentencing factors by failing to fully develop this argument in its opposition filing. We disagree, observing that the government had argued, in its opposition, that the factors could not support releasing Rivera and, in its reconsideration motion, described the district court's contrary conclusion as error.  Therefore, we consider the government's challenges to the court's weighing of the factors.

v. <u>Gibbons</u>, 553 F.3d 40, 47 (1st Cir. 2009)).  Therefore, we review this decision for abuse of discretion, and will find no abuse "as long as the court has provided a plausible explanation, and the overall result is defensible.'"  <u>United States</u> v. <u>Torres-Landrúa</u>, 783 F.3d 58, 68 (1st Cir. 2015) (quoting <u>United States</u> v. <u>Trinidad-Acosta</u>, 773 F.3d 298, 321 (1st Cir. 2014)).

In arguing that the court abused its discretion here the government points to the seriousness of Rivera's offense, and claims that the court failed to justify the disparity between Rivera's applicable guideline sentencing range, 210 to 262 months, and the amount of time he actually spent in prison, 135.5 months. In support, the government cites <u>United States</u> v. <u>Crespo-Rios</u>, where we reasoned that while "[t]here is no dispute that a district court can vary, even dramatically, from a guideline sentencing range based on the factors enumerated in § 3553, . . . if the district court 'decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'"  787 F.3d 34, 37-38 (1st Cir. 2015) (quoting <u>Gall</u> v. <u>United States</u>, 552 U.S. 38, 50 (2007)).

We do not find the court's explanation of its § 3553(a) analysis lacking or scant.  Immediately following its description of Rivera's rehabilitation record, the court indicated:

> [Rivera] has already served more than 11 years of his sentence, 57% of his statutory term (and 66% if you take into account his expected release date for good conduct in October 2026). As such, a modified sentence would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

In our view, the court's reasoning here stands in contrast to the insufficient explanation provided by the sentencing court in Crespo-Rios, which we found deficient because "the district court focused exclusively on the defendant's potential for rehabilitation and low risk of recidivism" and "did not explain how it had weighed the other factors laid out in § 3553(a), or why this particular sentence was appropriate in light of these factors." 787 F.3d at 38.

Conversely, the district court here made clear its belief that, even when considering the seriousness of Rivera's offense, Rivera's rehabilitation record and the fact that he had already served a slight majority of his sentence amply justified his functional variance. See United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011) (noting that an appellate court "must assay the record as a whole to gauge the sentencing judge's thought process"). We also credit the fact that the court expressly identified its consideration of the factors the government argues were ignored; "the court below may not have waxed longiloquent but 'brevity is not to be confused with inattention.'" United States v. Santiago-Rivera, 744 F.3d 229, 233 (1st Cir. 2014) (quoting

United States v. Turbides-Leonardo, 468 F.3d 34, 42 (1st Cir. 2006)). All in all, we consider the court's explanation for its sentence reduction plausible.

But was the court's reduction here likewise defensible -- that is, reasonable? As we have routinely observed, "reasonableness is a protean concept, not an absolute. We think it follows that there is not a single reasonable sentence but, rather, a range of reasonable sentences. Consequently, reversal will result if—and only if—the sentencing court's ultimate determination falls outside the expansive boundaries of that universe." United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008) (internal citation omitted). Accordingly, even when reviewing a sentence reduction that might be likened to a large variance from the applicable guideline sentencing range, we "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the [reduction]." Id. "Further, '[i]n the sentencing context, we evaluate claims of unreasonableness in light of the totality of the circumstances.'" United States v. Pupo, 995 F.3d 23, 29 (1st Cir. 2021) (quoting United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013)).

The government argues that the court's reduction here was unreasonable given the "seriousness of [Rivera's] offense," and therefore failed "to promote respect for the law" and "provide

just punishment for [his] offense." See 18 U.S.C. § 3553(a)(2)(A). We disagree.

In its order the court discussed the amount of time Rivera had already served, and modified his supervised release term to include three years of home confinement and electronic monitoring.[33] The court also gave a nod to Rivera's rehabilitation record, which his compassionate release motion had argued satisfied the objectives of deterrence and protection of the public, other § 3553(a) factors. See 18 U.S.C. § 3553(a)(2)(B), (C) (requiring the court to consider "the need for the sentence imposed (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant"); see also United States v. Zayas-Ortiz, 808 F.3d 520, 524 (1st Cir. 2015) (consulting "the record as a whole" in order to "infer the pertinent factors taken into account by the court below").

As we understand it, the court, after weighing the § 3553(a) factors against those favoring Rivera's release (at least as presented by the litigants herein) found them satisfied

---

[33] The government also suggests that the court should have considered the "benefits" of Rivera's plea agreement as part of its § 3553(a) analysis. While it is correct that the court made no express mention of Rivera's plea deal, we are aware of no case law that required it to. See Hughes v. United States, 138 S. Ct. 1765, 1777 (2018) ("The district court can consider the benefits the defendant gained by entering a Type-C agreement when it decides whether a reduction is appropriate (or when it determines the extent of any reduction)[.]") (emphasis added).

and explained why that was so.  In our view on balance and based on the totality of the circumstances, we cannot say it was unreasonable for the court to have arrived at this conclusion. There is no "requirement that a district court afford each of the section 3553(a) factors equal prominence.  The relative weight of each factor will vary with the idiosyncratic circumstances of each case, and the sentencing court is free to adapt the calculus accordingly."  United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006) (internal citation omitted).  We see no abuse of discretion.

## V.  Conclusion

For the foregoing reasons, we affirm the district court's grant of Rivera's motion for compassionate release and denial of the government's subsequent motion to reconsider.[34]

---

[34] Having affirmed both of the district court's rulings below, we have no reason to consider the government's arguments urging us, should we vacate either decision, to reverse the district court's rulings rather than remand for further proceedings.