# United States Court of Appeals
## For the First Circuit

No. 22-1714

UNITED STATES,

Appellee,

v.

EDISON BURGOS-MONTES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Alejandra Bird-López, Assistant Federal Public Defender, with
whom Héctor L. Ramos-Vega, Interim Federal Public Defender,
District of Puerto Rico, Franco L. Pérez-Redondo, Assistant
Federal Public Defender, Supervisor, Appeals Section, and Rachel
Brill, Federal Public Defender, District of Puerto Rico, were on
brief, for appellant.

Sean P. Murphy, with whom W. Stephen Muldrow, United States
Attorney, Mariana E. Bauzá-Almonte, Assistant United States
Attorney, Chief, Appellate Division, and David C. Bornstein,
Assistant United States Attorney, were on brief, for appellee.

June 30, 2025

**RIKELMAN**, <u>Circuit Judge</u>.  Edison Burgos-Montes, who is in his mid-fifties and serving a life sentence, seeks compassionate release based on his serious medical conditions.  In late 2021, Burgos filed a motion with the district court requesting his release, arguing primarily that the Bureau of Prisons' (BOP) ongoing failure to provide adequate treatment for his severe hypertension and obstructive sleep apnea was an "extraordinary and compelling reason[]" to reduce his sentence.  18 U.S.C. § 3582(c).  The district court found that Burgos was receiving "adequate medical, dental and psychological care" and denied his motion without prejudice.  Burgos contends that this finding was clearly erroneous, and we agree in part.  We conclude that the district court overlooked the undisputed evidence demonstrating that, almost one year after Burgos's sleep apnea diagnosis and despite his ongoing severe hypertension, the BOP had yet to provide Burgos with the established treatment for sleep apnea.  Thus, we vacate the district court's order and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Relevant Facts

Burgos began serving his prison sentence at USP Pollock, a BOP Care Level 1 medical facility.[1] During his time at Pollock, he suffered from uncontrolled hypertension, which places an individual at risk of congestive heart failure, heart attack, and death. Obstructive sleep apnea can cause or exacerbate hypertension.

Burgos's medical records from Pollock are replete with evidence of his chronically high blood pressure. The records include regular blood pressure readings ranging from 164/94 on the low end to 201/117 on the high end, indicating a hypertensive crisis. Indeed, in 2021, medical records show Burgos with only one normal blood pressure reading.

Even though Pollock medical staff prescribed Burgos six different antihypertensive medications, his high blood pressure persisted. The staff's attempts to adjust the combination and dosage of Burgos's medications did not improve his condition. On

---

[1] According to the BOP's Care Level Classification Guide, Care Level 1 inmates "are less than 70 years of age," "are generally healthy," and may have "limited medical needs that can be easily managed by clinician evaluations every 6-12 months." Fed. Bureau of Prisons, Clinical Guidance: Care Level Classification for Medical and Mental Health Conditions or Disabilities 2 (2019), https://www.bop.gov/resources/pdfs/care_level_classification_gui de.pdf [https://perma.cc/3P9N-UAK2] [hereinafter "BOP Clinical Guidance"].

top of his hypertension, Burgos also reported experiencing headaches and chest pains so severe that they caused him to vomit. As a result, the Pollock medical staff prescribed a new medication specifically to manage his chest pain.

Burgos's high blood pressure readings continued even after the BOP transferred him to FCC Coleman, a Care Level 3 medical facility, in September 2021.[2] For example, Burgos was hospitalized for three days in June 2022, after multiple elevated blood pressure readings on a single day (175/104, 193/133, and 204/129), two of which reached crisis levels. And earlier that year, Burgos ran out of his antihypertensive medications for five days and his blood pressure required him to reschedule a dental procedure.

Coleman medical staff also tried to adjust Burgos's medication regimen and took him off one medication, furosemide. After his hospitalization, however, the medical staff re-prescribed furosemide.

The parties point to conflicting evidence in the record regarding whether and to what extent Burgos contributed to his medication regimen disruptions. The government highlights

---

[2] Care Level 3 inmates "have complex, and usually chronic" conditions that require "frequent clinical contacts to maintain control or stability of their condition." They also may "require periodic hospitalization." BOP Clinical Guidance, supra note 1, at 3.

statements in Burgos's medical records that furosemide was discontinued "due to misuse/diversion by the inmate." But a contemporaneous evaluation from a Coleman staff member states that Burgos was "taking [his] medication in correct dosages at [the] correct time" in a "responsible" manner. Relatedly, the parties also dispute whether the five-day lapse in medication that postponed Burgos's dental procedure was the result of him "not taking his medications due to side effects," or the result of medical staff negligence.

Both before and after his transfer to Coleman, Burgos also complained of problems sleeping: He regularly woke up "gasping for air," snored loudly during the night, and experienced fatigue and trouble concentrating during the day. After scoring poorly on a sleep questionnaire, he received a provisional sleep apnea diagnosis in October 2020, while he was still at Pollock.

Burgos was scheduled for a "specialty procedure" related to his difficulty breathing, presumably a sleep study, by the "target date" of December 31, 2020. According to his medical records, however, he did not undergo a sleep study at Pollock until six months later, on June 30, 2021. Following that sleep study, Burgos received a confirmatory diagnosis of sleep apnea in October 2021, soon after his transfer to Coleman. For unexplained reasons, this diagnosis was not contemporaneously recorded in Burgos's medical file.

Even after undergoing the June 2021 sleep study and receiving a sleep apnea diagnosis in October 2021, Burgos did not receive the standard treatment for sleep apnea: a Continuous Positive Airway Pressure (CPAP) machine.[3] In April 2022, Burgos met with an outside cardiologist, who recommended that Burgos receive a CPAP machine "ASAP, as this will improve blood pressure values and energy." Still, Burgos was not provided with a CPAP machine.

In May 2022, nearly a year after his first sleep study, Burgos completed another sleep questionnaire at Coleman, which again indicated that he suffered from obstructive sleep apnea. Coleman medical staff recommended that Burgos undergo a second sleep study but did not indicate in his file why another study was necessary to diagnose him. Indeed, at the time, sleep apnea was already listed in Burgos's medical records as a "current" "health problem[]."

As of July 2022, almost one year after his sleep apnea diagnosis, Burgos had yet to undergo the second sleep study or receive a CPAP machine. He remains incarcerated at Coleman.

---

[3] A standard CPAP machine is a mask that helps treat sleep apnea by delivering continuous air through a patient's mouth and/or nose while they sleep. The continuous flow of air keeps the tongue, uvula, and soft palate from obstructing the patient's airway. See CPAP Machine, Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/22043-cpap-machine [https://perma.cc/NXU5-2DBV] (last visited June 4, 2025).

## B. Procedural History

After exhausting his administrative remedies with the BOP, Burgos filed a motion for compassionate release with the district court in late November 2021, two months after he was transferred to Coleman. In his motion, Burgos contended that he was suffering from multiple "serious medical conditions" that warranted a sentence reduction, including hypertension, sleep apnea, and high risk of COVID-19 infection.[4]

Burgos attached a letter from Dr. George Bren, a board-certified cardiologist, in support of his motion. In his letter, Dr. Bren stated that he had evaluated Burgos's medical records from July 2019 to September 2021 and concluded that Burgos suffered from multiple medical conditions for which the BOP was providing inadequate care.

In particular, Dr. Bren offered his medical opinion that Burgos suffered from "poorly controlled" hypertension, as evidenced by his elevated blood pressure and a September 2020 electrocardiogram showing changes to Burgos's heart structure. He concluded that "[a]djustment of antihypertensive medications has been slow and without a logical basis," highlighting the BOP's decision to switch Burgos "off a 'stronger' medication and [onto] a 'weaker' medication."

---

[4] Burgos does not raise his COVID-related arguments on appeal.

Dr. Bren also explained that Burgos suffered from "[p]robable obstructive sleep apnea," and that the "well-documented consequences" of untreated sleep apnea included "heart failure and pulmonary hypertension." Dr. Bren recommended that the BOP provide Burgos with a CPAP machine. He also noted that Burgos suffered from chest pain, esophageal spasm, obesity, elevated cholesterol, and possible long COVID.

The government filed its initial opposition to Burgos's compassionate release motion in January 2022 and focused primarily on Burgos's COVID-related arguments. Burgos replied that the government had ignored most of Dr. Bren's medical findings, and he provided evidence of his additional elevated blood pressure readings from October 2021 and January 2022.

The district court determined that the government "ha[d] not adequately responded to [Burgos]'s argument and Dr. Bren's Report regarding [Burgos']s deteriorated and deteriorating health and BOP's inability to provide him with adequate care." It ordered the government to do so promptly.

To comply with the district court's order, in May 2022, the government submitted a letter from Dr. Gary Venuto, the Clinical Director at Coleman (the "May letter"). In the May letter, Dr. Venuto briefly summarized Burgos's medical care, confirmed that Burgos was scheduled for another sleep study "to rule out the possibility of obstructive sleep apnea as a root cause

of his hypertension," and explained that the health services team was conducting further review of "[t]he medical information provided by Dr. George Bren."  Burgos replied, pointing out that Dr. Venuto's letter confirmed that he "ha[d] not been given a CPAP machine," despite his October 2021 sleep apnea diagnosis and the contemporaneous notation in his medical record that sleep apnea was a "current" health condition.  The district court ordered the government to produce by early July the results of the further review by the Coleman medical team that Dr. Venuto had promised.

The government then submitted a second letter from Dr. Venuto (the "July letter"), as well as Burgos's updated medical records.  In the July letter, Dr. Venuto chronicled Burgos's medical care since his arrival at Coleman ten months earlier.  He explained that the Coleman medical staff had adjusted Burgos's antihypertensive medication regimen but also informed Burgos that his lifestyle was contributing to his hypertension and that "medication alone w[ould] not alleviate" his condition.  According to Dr. Venuto, some of the changes or interruptions in medication that Burgos had raised to the district court were the result of Burgos's failure to alert medical staff that his medications had run out, as well as Burgos's noncompliance with medication procedures.  Dr. Venuto again noted that a second sleep study was "pending," but did not elaborate on why a second study had not

- 10 -

been conducted in the time between his May and July letters.[5] Nevertheless, Dr. Venuto concluded that Burgos "has received timely and appropriate medical, dental and psychological care."

The district court denied Burgos's motion for compassionate release on August 25, 2022. The order stated in full:

> At this time, Defendant has failed to establish extraordinary and compelling reasons justifying a reduction in sentence. Dr. George Bren's report regarding Defendant's deteriorated and deteriorating health and his assessment regarding BOP's inadequate care are based on his review of medical records and other legal documents spanning the period of 7/19/2019 to 9/24/2021. In the period covered by those records, Defendant was primarily housed at a Care Level 1 medical facility. Defendant is now being housed at FCC Coleman, a Care Level 3 medical facility. The Court credits Dr. Gary Venuto's assessment that Defendant is receiving adequate medical, dental, and psychological care since arriving at FCC Coleman. As such, the Court is not deciding at this time whether (i) Defendant poses a danger to the safety of any other person or the community, as provided by 18 U.S.C. § 3142(g); or (ii) a reduction is consistent with policy statement issued by the Sentencing Commission at U.S.S.G. 1B1.13. Defendant may refile the present motion provided he submits evidence to satisfy the requirements of 18 U.S.C. [§] 3582(c)(1)(A).

(Citations omitted.)

---

[5] Burgos's medical records state that the second sleep study was to be conducted on July 6, 2022. Dr. Venuto's letter was dated July 7.

Burgos appealed. We noted that the district court's order allowed Burgos to "refile the present motion," raising the question of whether it was an appealable "final decision" under 28 U.S.C § 1291, and we issued an order to show cause why the appeal should be allowed to proceed. Ultimately, we reserved decision on the jurisdictional question to the merits panel.

## II. STANDARD OF REVIEW

We review the district court's denial of Burgos's compassionate release motion for abuse of discretion. See United States v. Saccoccia, 10 F.4th 1, 4-5 (1st Cir. 2021). Under this umbrella standard, we review questions of law de novo and the district court's factual findings for clear error. See United States v. Cruz-Rivera, 137 F.4th 25, 30 (1st Cir. 2025) (citing United States v. Ruvalcaba, 26 F.4th 14, 19 (1st Cir. 2022)). "A district court's finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." United States v. Benito Lara, 56 F.4th 222, 226 (1st Cir. 2022) (cleaned up) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

The district court found that Burgos was receiving adequate medical care and, based on that finding, determined that Burgos had not demonstrated an "extraordinary and compelling" reason to support his sentence reduction request. Because it

- 12 -

concluded that Burgos failed the first prong of the compassionate release test, the court explicitly stated that it did not reach the remaining parts of the test. Accordingly, our analysis also focuses only on the first prong of the compassionate release test.

### III. DISCUSSION

We begin by addressing whether we have jurisdiction over the district court's order denying Burgos's motion for compassionate release. Concluding that we do, we turn to the merits and agree with Burgos that the district court clearly erred in finding that he was receiving "adequate" medical care at Coleman, at least as to his hypertension and sleep apnea.

### A. Jurisdiction

At the outset, we must consider whether the district court's order denying Burgos's motion without prejudice and permitting him to "refile the present motion" was a final judgment that we have jurisdiction to review. See García-Goyco v. L. Env't. Consultants, Inc., 428 F.3d 14, 18-19 (1st Cir. 2005) (noting the "scant authority" concerning whether denials "without prejudice and with leave to resubmit" are final orders). Despite the parties' agreement that we do have jurisdiction, "we have some independent responsibility to examine" the issue "before proceeding to the merits." Caribbean Mgmt. Grp., Inc. v. Erikon LLC, 966 F.3d 35, 40 (1st Cir. 2020).

When "evaluating the finality of an order entered after judgment," we "generally treat the post-judgment proceeding as if it were a lawsuit distinct from the [case] that generated the underlying judgment." Id. Here, Burgos's criminal case generated the underlying judgment and the compassionate release motion constitutes the post-judgment proceeding. See United States v. Rivera-Rodríguez, 75 F.4th 1, 16 (1st Cir. 2023) (recognizing that compassionate release motions are post-judgment proceedings and stating that "compassionate release appealability, 'like appealability with respect to the disposition of virtually all other post-judgment motions, is governed by 28 U.S.C. § 1291'" (quoting United States v. McAndrews, 12 F.3d 273, 277 (1st Cir. 1993))).

Under our precedent, "an order entered after judgment is final if it leaves the district court with no further work to resolve the post-judgment dispute and, thus, ends the post-judgment proceeding." Caribbean Mgmt., 966 F.3d at 40. Applying that reasoning, we have held that "[o]rders resolving compassionate release motions amount to final judgments" because they "satisf[y] the preconditions established by [§] 1291, for entry of the order leaves nothing further to be done." Rivera-Rodríguez, 75 F.4th at 16 (second alteration in original) (quoting McAndrews, 12 F.3d at 277).

The question is whether the district court's order here amounts to an exception to that general rule. As both parties acknowledge, the district court ruled on the merits of Burgos's compassionate release motion based on the evidence they had presented up to that point, including Burgos's medical records from July 2019 through June 2022. As a result, there was no "further work" for the district court to do to resolve Burgos's 2021 motion. Even if Burgos "refile[d]" a motion for compassionate release, that subsequent filing would not resuscitate his earlier 2021 motion. Instead, it would present a new request for compassionate release based on additional evidence about Burgos's health that would post-date the order on appeal. Thus, we conclude that the district court's order was a final judgment.[6]

_____

[6] We note one additional jurisdictional wrinkle that the parties did not raise. On the same day that Burgos filed his notice of appeal, he also filed a motion for reconsideration (which the district court later denied "in light of the pending appeal"). We conclude that the motion for reconsideration did not undermine the finality of the district court's order on the facts here. As it turned out, Burgos filed both the notice of appeal and the motion for reconsideration one day after the 14-day deadline for appealing the district court's order. Although Burgos later filed a request for a retroactive extension of his appeal deadline, which the district court granted, he did not reference his motion for reconsideration in that filing. Because Burgos's time to appeal had already run at the time that he filed his motion for reconsideration, that motion did not disturb the finality of the district court's order. See United States v. Healy, 376 U.S. 75, 78 (1964) (ruling that a motion to reconsider in criminal case filed before the deadline to appeal stopped the appeal clock and stating that "criminal judgments are nonfinal for purposes of appeal so long as timely rehearing petitions [or motions to

- 15 -

**B. The Compassionate Release Motion**

Assured of our jurisdiction, we turn to the merits. Under the compassionate release statute, a court may reduce a term of imprisonment if certain criteria are met and if the defendant has exhausted administrative remedies at the BOP. See 18 U.S.C. § 3582(c)(1)(A); see also Cruz-Rivera, 137 F.4th at 28.

In evaluating a compassionate release motion, the district court engages in a multi-step inquiry. Initially, it determines if the defendant is eligible for compassionate release by assessing (1) if the defendant has presented "extraordinary and compelling reasons warrant[ing] such a [sentence] reduction," and (2) whether the sentence reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). If the defendant is eligible for compassionate release under these two criteria, the district court then considers the relevant § 3553(a) sentencing factors and "determine[s] whether, in its discretion, the [sentence] reduction . . . is warranted in whole or in part under the particular circumstances of the case." Saccoccia, 10 F.4th at 4 (quoting Dillon v. United States, 560 U.S. 817, 827 (2010)).

---

reconsider] are pending" (emphasis added)); see also United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010) (a motion for reconsideration in a criminal case cannot "rejuvenate an extinguished right to appeal" (quoting Healy, 376 U.S. at 77)). To rule otherwise would improperly restart the appeal clock.

As Burgos explains, the district court's finding that he was receiving adequate medical care was essential to its conclusion that he had failed to meet the first prong of the compassionate release test: the demonstration of an "extraordinary and compelling" reason for a sentence reduction. Thus, Burgos argues, because this adequate-care finding was clearly erroneous, we should vacate the district court's decision so that it can re-evaluate if he meets the criteria for compassionate release.

The government does not dispute that untreated medical conditions like severe hypertension and obstructive sleep apnea can constitute "extraordinary and compelling reasons" for a reduced sentence under § 3582.[7] Rather, the dispute here focuses on whether the district court clearly erred in concluding as a factual matter that Burgos was receiving "adequate" medical care for these conditions at Coleman.

Burgos argues that the district court made two clearly erroneous factual findings in resolving this critical question.[8]

_____

[7] At oral argument, the government argued that, properly managed, sleep apnea that exacerbates hypertension does not meet the statutory standard. But Burgos's challenge centers on his claim that the BOP was not properly managing his sleep apnea.

[8] Burgos also suggests that the district court should not have relied on Dr. Venuto's July letter at all. Our review of his arguments, however, makes clear that Burgos does not lodge a legal challenge to Dr. Venuto's qualifications as an expert or otherwise challenge the admissibility of Dr. Venuto's opinion that Burgos was receiving adequate treatment. Rather, Burgos points out that Dr. Venuto's opinion was conclusory and failed to grapple with the

First, he asserts that the BOP was not adequately treating his sleep apnea, which likely contributed to his severe hypertension. In particular, he points to the evidence demonstrating the BOP's ongoing failure to provide him with a CPAP machine. Second, he contends that BOP was illogically and ineffectively adjusting his antihypertensive medication regimen.[9]

To set the stage for our analysis of Burgos's primary claim of error, related to the BOP's failure to treat his sleep apnea, we briefly review the key undisputed facts. First, while at Pollock, Burgos suffered from uncontrolled hypertension and "probable" obstructive sleep apnea. Second, untreated obstructive sleep apnea can be a "root cause" of hypertension. Third, the standard of care for obstructive sleep apnea is typically a CPAP machine, but the BOP had not provided Burgos with a CPAP machine by the time of the district court's order. And fourth, as the government conceded at oral argument, the district court had found

---

details of his medical record as to each of his medical conditions, including his sleep apnea. Thus, we treat Burgos's challenge to Dr. Venuto's July letter as part of his overarching claim that the record as a whole demonstrates that the district court's adequate-treatment finding was clearly erroneous.

[9] In a single sentence in his opening brief, Burgos also raises concerns about the BOP's response to his high cholesterol and chest pain but does not point us to any particular failures on the BOP's part in its treatment of these conditions. Thus, we deem any claims related to those aspects of the BOP's medical treatment to be waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 18 -

in an earlier text order that Burgos was receiving inadequate medical care at Pollock.[10]

Given these undisputed facts, we focus on whether the district court clearly erred in finding that Burgos was receiving adequate treatment for obstructive sleep apnea after his transfer to Coleman. The district court's order references only one piece of evidence on this issue: Dr. Venuto's statement in his July letter that Burgos was receiving "timely and appropriate medical, dental, and psychological care" at that facility. But that statement must be evaluated "given other, undisputed evidence in the record." United States v. Espinoza-Roque, 26 F.4th 32, 37 (1st Cir. 2022).

Our review of the record indicates that Burgos did not receive any sleep apnea treatment at Coleman.[11] Burgos did attend

---

[10] The government argues that Dr. Bren's opinion, which supported the district court's conclusion on this point, should not be credited because he was not Burgos's treating physician and had not personally observed Burgos. That argument is unpersuasive. Medical experts often are not treating physicians. Further, as Burgos points out, the government's own expert, Dr. Venuto, never claimed to have personally observed Burgos. Nevertheless, the government urges us to rely on Dr. Venuto's assessment.

[11] The government contends that Burgos has waived any argument relying upon the updated medical records it provided for the period from July 2021 to June 2022. We disagree. Burgos's citations to the relevant record excerpts in his briefs to the district court and to us, and his assertions that his health conditions had not improved even after his transfer to Coleman, sufficiently preserved the argument that he was continuing to receive inadequate care.

an appointment with an outside cardiologist who confirmed that he needed a CPAP machine as soon as possible, and Coleman medical staff discussed a second sleep study for Burgos. But Burgos never received any treatment for this condition, and the record contradicts the inference that a second sleep study was needed to provide such treatment, given the cardiologist's instruction that Burgos receive the CPAP machine immediately.

The government's responses to Burgos's arguments -- that Burgos lacked an official diagnosis of sleep apnea and that the promised second sleep study amounted to treatment -- are unpersuasive. To begin, the government insists that Burgos's medical records did not contain a "formal[] diagnos[is]" of sleep apnea, which, in its view, indicates that Burgos did not require any additional treatment for the condition. But the government has no explanation for why the notes in Burgos's medical file do not amount to such a diagnosis, at least as of July 2022. See United States v. Oquendo-Rivera, 586 F.3d 63, 68 (1st Cir. 2009) (holding that a failure to discuss "points that seem relevant" and "other points that gave at least some indirect support" to the defendant's position was clear error).

To recap: Burgos received his first provisional sleep apnea diagnosis in October 2020, after reporting to BOP medical staff that he was "gasping for air" at night and was unable to sleep. He then underwent a sleep study in June 2021. To be sure,

- 20 -

the results of the study are not included in his medical records. Nonetheless, those same records list sleep apnea as a "current" health condition, with a diagnosis date of October 2021. Further, there is no evidence in the record to contradict the opinion of the outside cardiologist that Burgos's sleep apnea likely contributed to his uncontrolled hypertension, for which Burgos was hospitalized while at Coleman.[12] Thus, the record leaves us with a "definite and firm conviction" that Burgos suffered from obstructive sleep apnea, which likely contributed to his hypertension.

Next, the government points out that Burgos's second sleep study was listed as an "urgent" priority and suggests that this is sufficient evidence that the BOP was adequately treating Burgos for sleep apnea. Even if we overlook that the "urgent" sleep study had yet to be conducted as of Dr. Venuto's second letter to the court, however, a sleep study is a diagnostic tool: The only treatment for sleep apnea discussed in Burgos's medical records is a CPAP machine. See Aponte-Dávila v. Mun. of Caguas, 828 F.3d 40, 48 (1st Cir. 2016) (holding that it was clear error to "plac[e] altogether too much emphasis on [a] factor" that

_____

[12] Dr. Venuto did opine that Burgos's blood pressure was an ongoing issue in part because Burgos was refusing to make necessary changes to his diet and exercise regimen. But he never suggested that Burgos's sleep apnea did not contribute to his hypertension; instead, Dr. Venuto confirmed in his May letter that could be the case.

- 21 -

"do[es] not [itself] result in a change" in the critical circumstance at issue). Indeed, as we have explained, in April 2022, an outside cardiologist recommended that Burgos receive a CPAP machine "ASAP" to treat his sleep apnea, without suggesting that additional diagnostic testing was needed. And Dr. Venuto acknowledged that as of July 2022, Burgos had still not received a CPAP machine. Further, there is no medical evidence in the record suggesting that a confirmatory sleep study is required for a CPAP machine to be prescribed when, as is the case here, the patient has already received a sleep apnea diagnosis. Thus, the evidence provides no support for the government's position that simply scheduling a second sleep study amounts to adequate treatment on these facts. Accordingly, we agree with Burgos that the district court clearly erred in finding that the BOP was providing adequate treatment for his sleep apnea.

Burgos next challenges the district court's finding that the BOP's antihypertensive medication regimen was adequate, but on this point, we disagree with him. Burgos's medical file indicates that on some occasions, he was not taking his medications, which Dr. Venuto noted could have contributed to any perceived inefficacy. And, as Dr. Venuto also explained, BOP staff at Coleman changed Burgos's medication regimen immediately in response to his hospitalization in June 2022, re-prescribing furosemide after it had been discontinued. Thus, the record

contains evidence to contradict Burgos's contention that alterations to his "flawed pharmaceutical regimen" were "slow and haphazard." So, we see no basis for disturbing the district court's factual finding on this issue.

To wrap up, we conclude that the district court's "critical finding" that Burgos was receiving adequate treatment for his sleep apnea was clearly erroneous. United States v. Henderson, 463 F.3d 27, 47 (1st Cir. 2006). That is because, as we have explained, the record is clear that nearly a year after Burgos received a sleep apnea diagnosis, months after a consulting cardiologist recommended that he receive a CPAP machine "ASAP," and even after his transfer to a higher-level care facility, the BOP had yet to provide Burgos with a CPAP machine or any other sleep apnea treatment. And there is no dispute that untreated sleep apnea for a patient like Burgos, who also suffers from severe hypertension, could amount to an "extraordinary and compelling" reason to grant compassionate release. See United States v. Trenkler, 47 F.4th 42, 50 (1st Cir. 2022) ("[T]he 'extraordinary and compelling' standard . . . contemplates that any number of reasons may suffice on a case-by-case basis, whether it's one, two, or ten."). So, we must vacate the district court's order denying Burgos's compassionate release motion and remand for it to consider whether Burgos has made a showing of an "extraordinary and compelling" reason under § 3582. We express no opinion on

whether Burgos can satisfy the remaining prongs of the compassionate release test.

## IV. CONCLUSION

For all these reasons, we **vacate** the district court's denial of Burgos's motion for compassionate release and **remand** for proceedings consistent with this opinion.